[No. 14354-9-I.   Division One.   July 21, 1986.]

KENNETH E. DENNIS, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

*Joseph Albo, Aaby, Knies, Robinson, Albo & Putman, Douglass North,* and *Hennings, Maltman, Weber & Reed,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Gregg Rodgers, Assistant,* for respondent.

HOLMAN, J.*—The central issue in this case is whether our workers' compensation act (Act) provides coverage for a disability directly caused by workplace aggravation of a previously nonsymptomatic, nondisabling disease. Under the Act, a worker is entitled to compensation to the extent of the disability when he or she demonstrates that the employment acted upon such a disease so as to cause a disability which did not previously exist.

Appellant Kenneth Dennis (claimant) was a sheet metal worker for 38 years who typically used tin snips with 9– to 18–inch blades from 4 to 5 hours each day. His claim is for the disabled condition of his wrists at age 56 due to aggravation of osteoarthritis by the constant use of the tin snips and other tools of his trade.

Claimant filed a disability claim with the Department of Labor and Industries which was rejected on the grounds that no industrial injury had been sustained and that his condition was not an occupational disease as defined under

---

*Judge Francis E. Holman is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

the statute. Claimant appealed from the denial, solely on the occupational disease issue. A hearing was held before an examiner who prepared a proposed order and decision favorable to claimant. Finding of fact 4 stated that the arthritis in claimant's wrists was aggravated as a direct result of claimant's use of tin snips and other tools of his trade such that by July 1980 he was unable to continue his trade.[1]

The Board of Industrial Insurance Appeals affirmed the evidentiary rulings of the examiner, including finding of fact 4, but rejected the proposed decision. It concluded that the osteoarthritis complained of was not an "occupational disease" as defined in the statute since the underlying arthritic condition did not have its origins in claimant's employment. Claimant appealed to the Superior Court for a trial de novo pursuant to RCW 51.52.110 and RCW 51.52.115. The Superior Court granted the Board's motion for summary judgment holding simply that the Board's decision was correct. This appeal followed.

The center of controversy is over what a disabled worker must show to meet the requirement in RCW 51.08.140[2] that an occupational disease arise "naturally . . . out of employment" in order to be compensable. Claimant contends the "naturally" requirement is met by demonstrating the logical relationship between the work and the disease—based disability. The Department argues the claimant must show the disease was contracted from the work to meet the "naturally" requirement; a disabling disease is a basis for compensation solely when it originates from the work itself.

---

[1]Finding of fact 4 states:

"As a direct result of the use of tin snips and other tools of the sheet metal worker's trade the arthritis affecting the claimant's wrists, and particularly the right wrist, progressed, developed and became aggravated to the extent that by July 1980 he was unable to continue employment as a sheet metal worker."

[2]RCW 51.08.140 states:

"'Occupational disease' means such disease or infection as arises *naturally* and *proximately* out of employment under the mandatory or elective adoption provisions of this title." (Italics ours.)

It contends that only a discrete injury in the course of employment may "light up" a preexisting condition such that compensation must be given for the resulting disability.

Both parties rely on older Supreme Court cases and more recent Court of Appeals decisions, which are not readily reconciled. Appellant also relies on the Act and its history. Since we are confronted with the proper application of a statutory definition not immediately clear by its terms in the context of a comprehensive act of legislation, we must look first to the Act and its heritage, then to the definition.[3]

## WORKERS' COMPENSATION

The Act invokes the State's police power to create the public system of providing compensation to workers for work–related injuries. The state system is expressly designed so that "sure and certain relief for workers, injured in their work, and their families and dependents is . . . provided regardless of questions of fault . . ." RCW 51.04.010. The Act states that "[t]here is a hazard in all employment" and that it is to be "liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010.

The statutory definition of "injury", RCW 51.08.100,[4] is narrow in its requirement that a sudden traumatic event produce an immediate or prompt result, apparently excluding the sort of gradual injury complained of here or as would arise in some other occupations. When read narrowly and in isolation, the statutory definition of occupational

---

[3]*Windust v. Department of Labor & Indus.*, 52 Wn.2d 33, 38, 323 P.2d 241 (1958); *Stewart Carpet Serv., Inc. v. Contractors Bonding & Ins. Co.*, 105 Wn.2d 353, 357–58, 715 P.2d 115 (1986).

[4]RCW 51.08.100 states:
· "'Injury' means a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom."

disease appears to also exclude the sort of injury complained of here while encompassing respiratory diseases such as asthma, silicosis, and asbestosis.

RCW 51.32.180 permits compensation for "disability from an occupational disease in the course of employment" to the same extent as for an injury or death under the Act. It thus equates disability from occupational diseases with injuries for compensation purposes. The Act does not compensate merely the contraction of, or having, an "occupational disease." A right to compensation only arises when such disease results in a disability. Once the claimant is informed by a physician of the occupational disease and that a claim may be filed for disability benefits, the statute of limitations for filing such claims begins to run. RCW 51.28.055. *See Williams v. Department of Labor & Indus.,* 45 Wn.2d 574, 575–76, 277 P.2d 338 (1954) (silicosis); *Nygaard v. Department of Labor & Indus.,* 51 Wn.2d 659, 662, 321 P.2d 257 (1958) (asthma).

The Act's underlying purpose of compensating work-related disability, whether by injury or disease, indicates a worker should be compensated if the occupational activities caused the disability as appears to be the case here. This accords with the history of the Act's provisions covering disease.

The first statutory provisions for compensating occupational diseases were passed in 1937. They and subsequent changes support the conclusion that the Legislature's primary concern is with compensating disability which is a result of work. The Laws of 1937, ch. 212, § 1(18), (19), provided compensation for disability arising from friction, rubbing, vibration, or pressure in the workplace.[5] Included

---

[5]The relevant statutory provisions provided:

Compensation shall be payable for *disabilities sustained* or death incurred by an employee resulting from the following occupational diseases:

. . .

(18) *Disability arising from* blisters or abrasions. Any process involving continuous friction, rubbing or vibration causing blisters or abrasions;

(19) *Disability arising from* bursitis or synovitis. Any process involving

under the section for occupational disease, these compensable disabilities are most accurately described as arising from continuous or gradual work–related injuries. This indicates that gradual injury disabilities, like this claim, are compensated under the occupational disease rather than the injury provision.[6] These initial provisions of coverage for occupational disease indicate that there was not the sort of gap in coverage between discrete injuries and occupational diseases as the Department now argues[7] exists in the current statutory structure when looking solely at the definitions.

Subsequent statutory changes have only broadened the coverage for disability due to disease. In 1939 the Legislature extended compensation for the diseases enumerated 2 years earlier to cases where the worker's prior exposure had been in a different state. It required a causal connection be shown between the disability and employment in Washington. The statute required that the disease be quiescent and nondisabling for 1 year prior to injurious exposure in Washington, "and that such exposure during such employment in the State of Washington activated the quiescent

---

continuous rubbing, pressure or vibration of the parts affected;
(Italics ours.) Laws of 1937, ch. 212, § 1. No compensation was provided for contracting the disease, nor was contraction in the workplace a condition precedent to compensation. The statute provided compensation for *disability arising from* the work. *See Williams v. Department of Labor & Indus.*, 45 Wn.2d 574, 575–76, 277 P.2d 338 (1954).

[6]*See* the Louisiana cases discussed *infra* at footnote 13 as to how that State chose to cover work–related disability from arthritis as gradual injury disabilities through its injury provision rather than the disease provisions. Professor Larson contends the meaningful distinction between compensation for such disabilities by injury/accident or disease has disappeared. *See* 1B A. Larson, *Workmen's Compensation* § 41.31 (1985).

[7]We note the opposite position taken on this matter in two 1947 published opinion letters of the Attorney General. He advised that under the 1947 definition of "occupational disease" a bus driver should receive compensation for the work–caused aggravation of a preexisting psychoneurosis to the point of "nervous attacks" and disability, when the aggravation was due to "the routine performance of the duties of a bus driver." *See* AGLO (May 2, 1947).

disease to the extent of disability". Laws of 1939, ch. 135, § 1(22), p. 382, 385.

The 1941 Legislature made two changes which further broadened coverage. The first was to eliminate the specific enumeration of diseases covered under the Act in favor of more general language. An occupational disease was simply defined as "such disease or infection as arises naturally and proximately out of extra–hazardous employment." Laws of 1941, ch. 235, § 1. "Naturally" was added in committee to replace more restrictive language limiting occupational diseases to those due to conditions "characteristic of, and peculiar to" the work, indicating the rejection of those terms.[8] The second deleted the restrictions based on prior out–of–state employment, leaving only the requirement that a worker demonstrate the relationship between the work and the disability. *See* Laws of 1941, ch. 235, § 1. The language defining occupational disease remained unchanged until 1959 when the Legislature deleted the "extrahazardous" restriction on employment. Laws of 1959, ch. 308, § 4.[9] It has not been changed since.

■ Under the text and history of the Act the ultimate criterion in granting disability claims for injury or disease is whether or not the employment caused a disability which

---

[8] The original language in Senate Bill 190 defined occupational disease as "a disease which is due to causes and conditions which are present in, characteristic of, and peculiar to a particular extrahazardous occupation." The "characteristic of", and "peculiar to" language had been used as a limiting factor in prior cases, *see* cases discussed in *Department of Labor & Indus. v. Kinville,* 35 Wn. App. 80, 84–85, 664 P.2d 1311 (1983). It was deleted in committee and approved by the Senate on February 27, 1941. *See* Senate Journal, 27th Legislature (1941) at 440. Such change in language evinces the Legislature's intent to provide a greater degree of coverage for disabled workers by focusing on a causal connection between the disability and the work. This is buttressed by the second change made by the same Legislature, deletion of the restrictions related to prior out–of–state employment.

[9] An attempt to broaden the language of the Act generally by eliminating the extrahazardous restrictions on coverage under RCW 51.12.020 in that same session failed when the proposed change was vetoed. Laws of 1959, ch. 308, § 4. This change was made in 1971 and 1972.

did not previously exist. This is of fundamental importance, since it is a comprehensive act and the underlying legislative intent we are construing, not an isolated statute nor just the common law. This basic criterion in the Act, along with the specific history of the occupational disease statute, must guide our interpretation of the "naturally" requirement as we turn to the cases. *Windust v. Department of Labor & Indus.,* 52 Wn.2d 33, 38, 323 P.2d 241 (1958).

## CASE LAW

Cases in this area have not made clear distinctions between "disease" and "disability" for purposes of discussing compensation under the Act. As noted above, the touchstone for any compensation is that the injury—the disability—be caused by the work. RCW 51.04.010. Where that injury is a disability arising from an occupational disease, it must be shown that the disability was "naturally" and "proximately" caused by the work rather than by the natural progression of life. RCW 51.08.140.

The Department relies on *Favor v. Department of Labor & Indus.,* 53 Wn.2d 698, 336 P.2d 382 (1959) for its argument that the disabling disease must have been contracted by conditions existing in the extrahazardous employment to be compensable under the Act in the 1950's. *Favor* is distinguishable. The discussion of occupational diseases at pages 705–06 is dictum since the court ruled Favor failed to establish the causal connection between the employment and the disability from a heart occlusion by objective proof, thus failing to meet the proximate cause requirement. *Favor,* at 704–05.[10] Second, the court stated plainly that its dictum was of "the distinction between injury and occupational disease *as it relates to heart cases*" (italics ours), *Favor,* at 705, further precluding any controlling effect upon other classes of cases, such as the one before us. A

---

[10]*See also Parr v. Department of Labor & Indus.,* 46 Wn.2d 144, 150–51, 278 P.2d 666 (1955) (claimant must show causal relationship between "disabling asthmatic condition" and employment).

more recent occupational disease claim, relied on heavily by the Department, was also denied for proof problems. *Department of Labor & Indus. v. Kinville,* 35 Wn. App. 80, 664 P.2d 1311 (1983) (denying claim for psychiatric disability allegedly precipitated by anxiety arising from claimant's fears and expectations related to her supervisors and possible termination, rather than the nature or conditions of her work). There is no such proof problem in the case before the court. Claimant's physician based his opinion on the objective conditions of sheet metal work—the use of tin snips 4 to 5 hours per day for 38 years—and the objective condition of claimant's wrists as indicated by examination and X–ray. *Favor* and *Kinville* thus do not control this case.

The Department argues that *Kinville*'s analysis of the occupational disease statute should at least guide our application of the statute, if it does not control. We are not persuaded. *Kinville* construed "as arises naturally and proximately" to limit compensation to "diseases which are inherent in a claimant's particular occupation." *Kinville,* at 87. It then held that a claimant must establish "that the conditions producing his disease are peculiar to, or inherent in, his particular occupation", also noting that this construction was consistent with the history of the occupational disease statute. *Kinville,* at 87 & n.4. As discussed *supra,* the Legislature expressly rejected the "peculiar to" language in 1941 when framing the current occupational disease definition. The complete history of the Act and the occupational disease provision, apparently not presented to the *Kinville* court, teach that the Legislature's intent was and is to focus on the causal relationship between disease–based *disability* and the work or its conditions. We thus disagree for these historical reasons with *Kinville*'s exegesis of "arises naturally". That analysis misled the court to focus on the causal relationship of the occupation to the contraction of the disease rather than to the disability.

*Kinville* cited New York cases from 1938 and 1948 to support its analysis of the "naturally" requirement. *Kin-*

*ville,* at 88–89. Subsequent New York cases indicate that the proper focus under that analysis is on the cause of the disability rather than of the disease.[11] The more recent case of *Snyder v. Department of Labor & Indus.,* 40 Wn. App. 566, 699 P.2d 256 (1985) reached a similar conclusion in relying on the later New York cases. It stated that *Kinville* did not apply to "the issue [of] whether aggravation of a preexisting, nonsymptomatic disease is compensable under RCW 51.08.140 as an occupational disease." *Snyder,* at 569–70.[12]

■ Snyder claimed a disability from silicosis. He had previously worked out of state. His employer's examining physician gave the opinion that Snyder's silicosis was related to his occupation but was contracted before he began work with his company in 1979. The court stated in construing the "naturally" requirement that

> aggravation of a preexisting, asymptomatic disease may be compensable as an occupational disease within the meaning of RCW 51.08.140, provided that the employment conditions producing the aggravation are peculiar to, or inherent in, the particular occupation.

---

[11]*See Perez v. Pearl–Wick Corp.,* 56 A.D.2d 239, 392 N.Y.S.2d 496, 498 (1977) (granting compensation for disabling rheumatoid arthritis which had been dormant prior to work); *D'Angelo v. Loft Candy Corp.,* 33 A.D.2d 1077, 307 N.Y.S.2d 721 (1970) (awakening lumbosacral arthritis linked to nature of work activities). *Cf. Hollander v. Valor Clothers, Inc.,* 91 A.D.2d 731, 457 N.Y.S.2d 1002, 1003 (1982) (compensation denied because preexisting condition was active prior to employment; "some distinctive feature of the employment must cause disability by activating the condition").

[12]The concurrence noted that *Snyder v. Department of Labor & Indus.,* 40 Wn. App. 566, 699 P.2d 256 (1985) was controlled by the facts of *Kallos v. Department of Labor & Indus.,* 46 Wn.2d 26, 278 P.2d 393 (1955), and not its discussion of the Act or outside authorities. *Snyder,* at 576–77 (Worswick, C.J., concurring). *Kallos* was virtually identical to *Snyder* factually. It also involved compensation for "lighting up" previously asymptomatic silicosis contracted from earlier out-of-state work. *Kallos* ruled the claimant must establish that the change from nondisabling to disabling status meets the proximate cause test: that the change in condition "would not have occurred but for the condition existing in the extrahazardous employment." *Kallos,* at 29.

*Snyder,* at 575. We have already discussed the inappropriateness of construing the "naturally" requirement to include the "peculiar to" language rejected by the 1941 Legislature. *Snyder* however focused on the logical relationship of Snyder's disability to his work, as did *Kallos v. Department of Labor & Indus.,* 46 Wn.2d 26, 278 P.2d 393 (1955). Both granted the claim since the relationship was shown. Thus we interpret the "naturally" requirement in RCW 51.08.140 to mean simply that a claimant must show the logical relationship of the disease-based disability to the work or its attendant conditions. This was not done in either *Favor* or *Kinville,* and in both cases the claims were denied.

The *Snyder* court also relied on New York cases construing a similar statute as to when a disease is "natural to or inheres in" the work which focus on the cause of the disability rather than on whether the disease is "peculiar to" the work. *See Perez v. Pearl–Wick Corp.,* 56 A.D.2d 239, 392 N.Y.S.2d 496, 497–98 (1977); footnote 11, *supra.* The New York court reversed the denial of benefits and granted the disability claim. The claimant was asymptomatic when he began work in 1954. He had to quit work in 1971 when unable to perform because of his disabling condition from rheumatoid arthritis. The court held that compensation was payable for a previously dormant and nondisabling condition which becomes active as a result of the employment:

> The ultimate test is not the initiation or precipitation of the disease itself, but whether the employment acts upon that disease or condition in such a manner as to cause a disability which did not previously exist.

*Perez,* at 241. This test succinctly states the intent and effect of the Act and the occupational disease statute's 2-part requirement of natural and proximate causation.

There is abundant support for this logical approach. *Snyder*'s quotation of Judge Learned Hand construing an analogous federal workers' compensation statute is apropos to ours:

> The statute is not concerned with pathology, but with industry disability; and a disease is no disease until it manifests itself. Few adults are not diseased, if by that one means only that the seeds of future troubles are not already planted; and it is a common place that health is a constant warfare between the body and its enemies: an infection mastered, though latent, is no longer a disease, industrially speaking, until the individual's resistance is again so far lowered that he succumbs. . . .

*Snyder,* at 573 (quoting *Grain Handling Co. v. Sweeney,* 102 F.2d 464, 466 (2d Cir. 1939)). *See also Snyder,* at 573–74 & n.3 listing the 13 states which permit compensation for "a preexisting latent or quiescent disease aggravated during employment due to conditions peculiar to that occupation".[13]

The Department also argues that *Snyder,* relied upon heavily by claimant, is consistent with its position since both *Snyder* and *Kallos* involved situations where the worker initially contracted the respiratory disease from occupational activities, albeit the activities did not occur in

---

[13]To these we add a line of cases from Louisiana compensating for disabling arthritis. *Harper v. Kast Metals Corp.,* 397 So. 2d 529, 530–32 (La. Ct. App. 1981) (wrist disability caused by heavy manual labor acting on underlying arthritis); *Gales v. Great Atl. & Pac. Tea Co.,* 342 So. 2d 241 (La. Ct. App. 1977) (aggravation of dormant rheumatoid arthritis to point of disability compensable when done by routine work activities: when science knows little about the disease the worker cannot be held to show causation of the disease); *Lum v. Employers Mut. Liab. Ins. Co.,* 216 So. 2d 889 (La. Ct. App. 1968) (arthritic disability in wrists tied to assembly line work); *Roberson v. Liberty Mut. Ins. Co.,* 316 So. 2d 22 (La. Ct. App. 1975) (aggravation of preexisting arthritic back condition compensable).

These cases recognize coverage on the basis of gradual "injury" since Louisiana's workers' compensation act specifies what diseases are occupational diseases and excludes arthritis. Interestingly, the burden on the claimant is effectively the same as we adopt here: "It is sufficient to show merely that the disability was caused by a work activity which can be gradual and progressive in nature." *Harper,* at 531. *See also* 1B A. Larson, *Workmen's Compensation* § 41.63 (1985), generally, and pages 7–463 through 7–464:

> The ultimate working rule that seems to emerge is simply that a disability which would be held to arise out of the employment under the tests of increased risk and aggravation of a preexisting condition will be treated as an occupational disease.

(Footnotes omitted.)

Washington. It argues they provide no authority for whether the "naturally" requirement is met here, and that we must address the question of the applicability of the occupational disease statute to diseases not necessarily "contracted" in the claimant's work, wherever performed, but aggravated by employment to the point of disability. This we have done.

In sum, the Department's argument goes against the statute's history. Its acceptance would frustrate the fundamental purpose of the Act stated in RCW 51.04.010, the liberal construction provision in RCW 51.12.010, and the statute of limitation provision of RCW 51.28.055. Were we to focus on the contraction of the disease under the "naturally" analysis, we would become engaged in a protracted factual inquiry beyond the scope of the Act (and sometimes the realm of science), and a prohibited fault–based one at that. Since "injury" under RCW 51.04.010 includes disability from disease, we remain true to its spirit and letter by focusing on whether the disease–based disability was caused by the work or its conditions[14] to meet the "proximate" requirement, and the logical relationship of the disability to the work or its conditions to meet the "naturally" requirement. In many cases proof of one will provide proof of the other.

Moreover, the Department conceded at oral argument that, while osteoarthritis may be deemed an ordinary disease of life, "it can be converted to an occupational disease if Dennis shows the other test requirements: natural relation to work and a proximate one." Once the Department has conceded that an "ordinary disease of life" may be

---

[14]*See Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 44, 395 P.2d 633 (1964):

"We are, in this case, concerned only with the effect of the fumes and smoke that did exist upon this particular man. If his pulmonary difficulties are disabling, and if the fumes in the aluminum plant, though they be the perfumes of Arabia to others, are responsible for his pulmonary difficulties, his disability is attributable to his employment and he is entitled to treatment and such compensation as the facts and the law may warrant." (Citations omitted.)

deemed an occupational disease by showing its natural relation to work it has conceded that the inquiry is that which was described in *Kallos, Snyder,* and the New York cases: whether there is a logical relation of that disease–based disability to the employment or its conditions. The same approach must therefore be taken in an occupational disease context as occurs in the injury cases where the Department is forced to take workers as it finds them, whether they be unusually robust or unusually susceptible to disability through specific work activities or conditions.[15]

■ In this case the Department must concede proximate cause based upon the unchallenged finding of the hearing examiner which was affirmed by the Board. It contends, however, that the natural causation element must be proved by direct evidence that claimant was more likely to contract the osteoarthritis because of the nature of his work or its condition, and that this test is failed as a matter of law for lack of direct evidence, statistical or expert. This is too restrictive under the Act.[16] The claimant must only show a logical relationship between the disease–based disability and the work to meet the "naturally" requirement. This is in part to avoid undue proof problems as to whether the claimant was more likely to be disabled by a particular disease from a certain type of work, consistent with the goal of providing sure and certain relief without regard to fault. RCW 51.04.010. Further, the trier of fact may infer ultimate facts in a workers' compensation case. Where the

---

[15]*See, e.g., Miller v. Department of Labor & Indus.,* 200 Wash. 674, 682–83, 94 P.2d 764 (1939); *Harbor Plywood Corp. v. Department of Labor & Indus.,* 48 Wn.2d 553, 556–57, 295 P.2d 310 (1956) (hastening of inevitable disability and death from underlying cancer compensable where the hastening was caused by an industrial injury).

[16]The liberal construction provision in RCW 51.12.010 undercuts the Department's reliance at argument on *Cyr v. Department of Labor & Indus.,* 47 Wn.2d 92, 97, 286 P.2d 1038 (1955) and *Ehman v. Department of Labor & Indus.,* 33 Wn.2d 584, 206 P.2d 787 (1949) that claimant must be held to a "strict proof of the facts of his right to benefits" using only direct evidence since both these cases were decided prior to the change in statute.

expert testimony and the attending circumstances shown provide a basis for such an inference, said evidence is sufficient to support a judgment if the trier of fact wishes to make the inference. *Sacred Heart Med. Ctr. v. Carrado,* 92 Wn.2d 631, 635, 600 P.2d 1015 (1979); *Bennett v. Department of Labor & Indus.,* 95 Wn.2d 531, 533, 627 P.2d 104 (1981).

There is a sufficient factual basis for this case to be sent to a jury. Claimant's attending physician testified that the disease, though potentially in all people, does not always become symptomatic, and that some people are more susceptible to the disease than others due to several factors, not all of which are currently understood by the medical community. He indicated that osteoarthritis is presumably caused by "wear and tear phenomena". The physician further stated positively that it was the nature of claimant's work, constantly using tin snips over many years, which activated the osteoarthritis in his wrists to the point of disability. He also testified that although claimant had osteoarthritis in other parts of his body, nowhere else was it a disabling condition. This uncontradicted expert testimony would permit a trier of fact to infer the logical relationship between such disability and sheet metal work: that a sheet metal worker is more likely to develop disabling osteoarthritis in his or her wrists than somebody in a different profession or in nonworking life. Since osteoarthritis is caused by wear and tear phenomena and the nature of the work requires the use of tin snips which are long and heavy for 4 to 5 hours per day creating such a wear and tear pattern, the inference becomes reasonable when coupled to the objective circumstances that, although claimant had osteoarthritis in other parts of his body, it was only disabling in his wrists which were the focal point of his occupational activities. These facts weigh against the conclusion that the disability was from the natural progression of life. The Department may still argue against the inference. It is for the trier of fact to decide whether or not to accept it.

The summary judgment is reversed and the case is remanded for trial in accord with the Act.

SCHOLFIELD, C.J., and GROSSE, J., concur.

Review granted by Supreme Court October 7, 1986.